JOSEPH MCNALLY
Attorney for the United States,
Acting Under Authority Conferred by 28 U.S.C. § 515
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
RACHEL N. AGRESS (Cal. Bar. No. 281703)
Assistant United States Attorney
International Narcotics, Money Laundering,
  & Racketeering Section
DAVID Y. PI (Cal. Bar No. 337432)
Assistant United States Attorney
Major Frauds Section
      1400/1100 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-0487/3659
      Facsimile: (213) 894-0141/6269
      E-mail:    rachel.agress@usdoj.gov
                 david.pi@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**FILED**
CLERK, U.S. DISTRICT COURT

5/12/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____JB_____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>                 v.<br><br>MESHACH SAMUELS,<br>  aka "Meshack Samuels,"<br>  aka "Meshac Samuels,"<br>  aka "Adrian Samuels,"<br>  aka "Carl Bencillion,"<br>  aka "Carl Bensheley,"<br>  aka "shootaswish95_,"<br>  aka "shootaswish59_,"<br>  aka "shootaswish59__,"<br>  aka "WINNING OUR ONLY<br>   OPTION,"<br>  aka "helpthehelp_,"<br>  aka "Smokeeee Seasonn,"<br>  aka "Swish Entertainment<br>      Inc.,"<br><br>            Defendant. | CR No. 8:22-30-CJC<br><br>PLEA AGREEMENT FOR DEFENDANT<br>MESHACH SAMUELS |

1.   This constitutes the plea agreement between MESHACH SAMUELS ("defendant") and the United States Attorney's Office for the Central District of California (the "USAO") in the above-captioned case and the investigation of defendant for being a felon in possession of firearms and ammunition, conspiracy to commit a bank fraud scheme, and wire fraud, theft of government property and aggravated identity theft, described in the agreed-to factual basis set forth in paragraph 13 below.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authority.

<u>DEFENDANT'S OBLIGATIONS</u>

2.   Defendant agrees to:

a.   Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to Counts One, Two and Three of a superseding information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with two counts of being a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1) (Counts One and Two) and conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349 (Count Three).

b.   Not contest facts agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement.

d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.   Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g.   Agree to and not oppose the imposition of the following conditions of probation or supervised release:  The defendant shall submit defendant's person and any property under defendant's control, including any residence, vehicle, papers, computer and other electronic communication or data storage devices and media, and effects, to suspicion-less search and seizure at any time of the day or night by any law enforcement or probation officer, with or without a warrant, and with or without cause; and if stopped or questioned by a law enforcement officer for any reason, defendant shall notify that officer that defendant is on federal supervised release and subject to search.

h.   Pay the applicable special assessments at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

i.   At or before the time of sentencing, make a prejudgment payment by delivering a certified check or money order to the Fiscal Clerk of the Court in the amount of $5,000 to be applied to satisfy defendant's anticipated criminal debt.  Payments may be made to the Clerk, United States District Court, Fiscal Department, 255 East Temple Street, Room 1178, Los Angeles, California 90012.

j.   Defendant agrees that any and all criminal debt ordered by the Court will be due in full and immediately.  The

3

1    government is not precluded from pursuing, in excess of any payment

2    schedule set by the Court, any and all available remedies by which to

3    satisfy defendant's payment of the full financial obligation,

4    including referral to the Treasury Offset Program.

5         k.    Complete the Financial Disclosure Statement on a form

6    provided by the USAO and, within 30 days of defendant's entry of a

7    guilty plea, deliver the signed and dated statement, along with all

8    of the documents requested therein, to the USAO by either email at

9    usacac.FinLit@usdoj.gov (preferred) or mail to the USAO Financial

10   Litigation Section at 300 North Los Angeles Street, Defendant agrees

11   that defendant's ability to pay criminal debt shall be assessed based

12   on the completed Financial Disclosure Statement and all required

13   supporting documents, as well as other relevant information relating

14   to ability to pay.

15        l.    Authorize the USAO to obtain a credit report upon

16   returning a signed copy of this plea agreement.

17        m.    Consent to the USAO inspecting and copying all of

18   defendant's financial documents and financial information held by the

19   United States Probation and Pretrial Services Office.

20        n.    Defendant further agrees:

21        i.    To forfeit all right, title, and interest in and

22   to any and all monies, properties, and/or assets of any kind, derived

23   from or acquired as a result of, or used to facilitate the commission

24   of, or involved in the illegal activity to which defendant is

25   pleading guilty, specifically including, but not limited to, the

26   following:

27             (1)  One Ruger, Model LCP, .380 caliber semi-

28   automatic pistol, bearing serial number 374-81336;

(2)   Four rounds of Remington Arms .380 automatic caliber ammunition;

(3)   One Glock Model 19X, 9mm caliber pistol, bearing serial number BTRE485;

(4)   One Sarsilmaz Model SAR 9, 9mm caliber pistol bearing serial number T1102-20BV72714;

(5)   One Taurus Model G2C, 9mm caliber pistol bearing serial number ABG731850;

(6)   One Springfield Armory Model XD-40, .40 caliber pistol bearing serial number MG340367;

(7)   One SCCY Industries model CPX-2, 9mm caliber pistol bearing serial number 896882;

(8)   All ammunition seized from 150 Crowther Ave, Apt #508, Placentia, California on or about March 28, 2022, including:

(a)   Thirty-nine rounds of 9mm ammunition;

(b)   Fourteen rounds of S&W .40 caliber ammunition;

(c)   One ring encrusted with diamonds;

(9)   $44,777 in U.S. currency (collectively, the "Forfeitable Property").

ii.  To the Court's entry of an order of forfeiture at or before sentencing with respect to the Forfeitable Property and to the forfeiture of the property.

iii. That the Preliminary Order of Forfeiture shall become final as to the defendant upon entry.

iv.  To take whatever steps are necessary to pass to the United States clear title to the Forfeitable Property, including,

without limitation, the execution of a consent decree of forfeiture and the completing of any other legal documents required for the transfer of title to the United States.

v.    Not to contest any administrative forfeiture proceedings or civil judicial proceedings commenced against the Forfeitable Property.  If defendant submitted a claim and/or petition for remission for all or part of the Forfeitable Property on behalf of himself or any other individual or entity, defendant shall and hereby does withdraw any such claims or petitions, and further agrees to waive any right he may have to seek remission or mitigation of the forfeiture of the Forfeitable Property.  Defendant further waives any and all notice requirements of 18 U.S.C. § 983(a)(1)(A) and/or requirements of the Government to commence forfeiture actions pursuant to 18 U.S.C. § 924(d)(1).

vi.    Not to assist any other individual in any effort falsely to contest the forfeiture of the Forfeitable Property.

vii. Not to claim that reasonable cause to seize the Forfeitable Property was lacking.

viii.    To prevent the transfer, sale, destruction, or loss of the Forfeitable Property to the extent defendant has the ability to do so.

ix.    That forfeiture of Forfeitable Property shall not be counted toward satisfaction of any special assessment, fine, restitution, costs, or other penalty the Court may impose.

o.    With respect to any criminal forfeiture ordered as a result of this plea agreement, defendant waives: (1) the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcements of

the forfeiture sentencing, and incorporation of the forfeiture in the judgment; (2) all constitutional and statutory challenges to the forfeiture (including by direct appeal, habeas corpus or any other means); and (3) all constitutional, legal, and equitable defenses to the forfeiture of the Forfeitable Property in any proceeding on any grounds including, without limitation, that the forfeiture constitutes an excessive fine or punishment.  Defendant acknowledges that forfeiture of the Forfeitable Property is part of the sentence that may be imposed in this case and waives any failure by the Court to advise defendant of this, pursuant to Federal Rule of Criminal Procedure 11(b)(1)(J), at the time the Court accepts defendant's guilty plea.

THE USAO'S OBLIGATIONS

3.  The USAO agrees to:

a.  Not contest facts agreed to in this agreement.

b.  Abide by all agreements regarding sentencing contained in this agreement.

c.  At the time of sentencing, move to dismiss the underlying indictment as against defendant.  Defendant agrees, however, that at the time of sentencing the Court may consider any dismissed charges in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed.

d.  At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offenses up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to

U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

e.   Except for criminal tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C. § 371), not further criminally prosecute defendant for violations of 18 U.S.C. §§ 371, 641, 1028, 1028A, 1029, 1343, and 1344 arising out of defendant's conduct described in the agreed-to factual basis set forth in paragraph 14 below.  Defendant understands that the USAO is free to criminally prosecute defendant for any other unlawful past conduct or any unlawful conduct that occurs after the date of this agreement.  Defendant agrees that at the time of sentencing the Court may consider the uncharged conduct in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed after consideration of the Sentencing Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

f.   Not seek a sentence of imprisonment above the mid-point of the applicable Sentencing Guidelines range, provided that the offense level used by the Court to determine that range is 26 or higher and provided that the Court does not depart downward in offense level or criminal history category.  For purposes of this agreement, the mid-point of the Sentencing Guidelines range is that defined by the Sentencing Table in U.S.S.G. Chapter 5, Part A.

<u>NATURE OF THE OFFENSES</u>

4.   Defendant understands that for defendant to be guilty of the crimes charged in Counts One and Two, that is, felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1), the following must be true:  (1) defendant knowingly

8

possessed a firearm or ammunition; (2) the firearm or ammunition had been transported from one state to another, or between a foreign state and the United States; (3) at the time the defendant possessed the firearm or ammunition, defendant had been convicted of a crime punishable by imprisonment for a term exceeding one year; and (4) at the time the defendant possessed the firearm or ammunition, defendant knew that he had been convicted of a crime punishable by imprisonment for a term exceeding one year.

5.   Defendant understands that for defendant to be guilty of the crime charged in Count Three, that is, conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, the following must be true: (1) there was an agreement between two or more persons to commit the crime of bank fraud in violation of 18 U.S.C. § 1344(1); and (2) defendant became a member of the conspiracy knowing of at least one its objects and intending to help accomplish it.  Defendant further understands that the elements of the crime of bank fraud, in violation of 18 U.S.C. § 1344(1), are: (1) defendant knowingly executed or attempted to execute a scheme to defraud a financial institution as to something of value; (2) defendant acted with the intent to defraud the financial institution; and (3) the financial institution was federally insured.

<u>PENALTIES AND RESTITUTION</u>

6.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 922(g)(1), as charged in the Superseding Information, is: ten years' imprisonment; a three-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss

resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

7. Defendant understands that the statutory maximum sentence that the Court can impose for a violation of 18 U.S.C. § 1349, Conspiracy to Commit Bank Fraud, as charged in the Superseding Information, is: 30 years' imprisonment; a five-year period of supervised release; a fine of $1 million or twice the gross gain or loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

8. Defendant understands, therefore, that the total maximum sentence for all offenses to which defendant is pleading guilty is: fifty years imprisonment; a five-year period of supervised release; a fine of $1,500,000 or twice the gross gain or gross loss resulting from the offenses, whichever is greatest; and a mandatory special assessment of $300.

9. Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements. Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

10. Defendant understands that defendant will be required to pay full restitution to the victim(s) of the offenses to which defendant is pleading guilty. Defendant agrees that, in return for the USAO's compliance with its obligations under this agreement, the

Court may order restitution to persons other than the victim(s) of the offenses to which defendant is pleading guilty and in amounts greater than those alleged in the counts to which defendant is pleading guilty.  In particular, defendant agrees that the Court may order restitution to any victim of any of the following for any losses suffered by that victim as a result:  (a) any relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with the offenses to which defendant is pleading guilty; and (b) any counts dismissed and charges not prosecuted pursuant to this agreement as well as all relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with those counts and charges.  The parties currently believe that the applicable amount of restitution is approximately $423,087.02, but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

11.  Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty pleas.

12.   Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the convictions in this case makes it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States.  Defendant may also be denied United States citizenship and admission to the United States in the future. Defendant understands that while there may be arguments that defendant can raise in immigration proceedings to avoid or delay removal, removal is presumptively mandatory and a virtual certainty in this case.  Defendant further understands that removal and immigration consequences are the subject of a separate proceeding and that no one, including his attorney or the Court, can predict to an absolute certainty the effect of his convictions on his immigration status.  Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his pleas may entail, even if the consequence is automatic removal from the United States.

<u>FACTUAL BASIS</u>

13.   Defendant admits that defendant is, in fact, guilty of the offenses to which defendant is agreeing to plead guilty.  Defendant and the USAO agree to the statement of facts provided below and agree that this statement of facts is sufficient to support pleas of guilty to the charges described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 15 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

<u>Felon in Possession of Firearms and Ammunition</u>

<u>on August 29, 2021 and on March 28, 2022</u>

12

1    On August 29, 2021, in Orange County, within the Central
2  District of California, defendant knowingly and unlawfully possessed
3  a firearm and ammunition, namely: (1) a Ruger, Model LCP, .380
4  caliber semi-automatic pistol, bearing serial number 374-81336, that
5  was manufactured in Arizona (the "Ruger"); and (2) four rounds of
6  Remington Arms .380 automatic caliber ammunition that was
7  manufactured in Connecticut or Arkansas (the "Remington Ammunition").
8  At the time defendant possessed the firearm and ammunition, he had
9  been convicted of multiple felonies, and he knew he had been
10  convicted of such crimes.

11    Specifically, on August 29, 2021, Costa Mesa Police Department
12  ("CMPD") officers stopped defendant in a car he was driving because
13  the car's registration was expired.  The officers ultimately searched
14  defendant and found the Ruger, loaded with the Remington Ammunition,
15  in his underwear.  The Ruger and Remington Ammunition were all
16  manufactured outside of California, and thus, before August 29, 2021,
17  had been shipped or transported from other states to California in
18  interstate commerce.

19    Additionally, on March 28, 2022, in Orange County, within the
20  Central District of California, defendant knowingly and unlawfully
21  possessed five firearms, namely: (1) a Glock Mode 19X, 9mm caliber
22  pistol, bearing serial number BTRE485, that was manufactured in
23  Austria (the "Glock"); (2) a Sarsilmaz Model SAR9, 9mm caliber
24  pistol, bearing serial number T1102-20BV72714, that was manufactured
25  in Turkey (the "Sarsilmaz"); (3) a Taurus Model G2C, 9mm caliber
26  pistol, bearing serial number ABG731850, that was manufactured in
27  Brazil (the "Taurus"); (4) a Springfield Armory Model XD-40, .40
28  caliber pistol, bearing serial number MG340367, that was manufactured

in Croatia (the "Springfield"); and (5) a SCCY Industries Model CPX-2, 9mm caliber pistol, bearing serial number 896882, that was manufactured in Florida (the "SCCY").

Specifically, on March 28, 2022, special agents with Homeland Security Investigations ("HSI") executed a search warrant at defendant's residence in Placentia, California.  During the search of his residence, HSI special agents found the Glock, Sarsilmaz, Taurus, Springfield, and SCCY firearms, along with approximately 53 rounds of ammunition.  Defendant possessed each of the firearms on March 28, 2022.  The Glock was loaded with seventeen rounds of 9mm ammunition in an extended magazine and an addition round of 9mm ammunition chambered in the Glock.  The Glock, Sarsilmaz, Taurus, Springfield, and SCCY were all manufactured outside of California, and thus, before March 28, 2022, had been shipped or transported from other states or foreign countries to California.

Before defendant's knowing and unlawful possession the above-referenced firearms and ammunition, defendant had been previously convicted of the following felony offenses, each punishable by a term of imprisonment exceeding one year:

(1) Aggravated Battery on a Law Enforcement Officer, in violation of Florida Statutes Section 784.07(2)(d), with enhancements for Attempted Murder of a Law Enforcement Officer and Aggravated Battery, in violation of Florida Statutes Sections 782.065, 777.04, 775.0823 and 775.087, in the County Court for the State of Florida, County of Miami-Dade, Case Number F15-007045, on or about August 30, 2016;

(2) Fleeing or Attempting to Elude a Law Enforcement Officer, in violation of Florida Statute Section 316.1935(1), in the County Court

14

for the State of Florida, County of Miami-Dade, Case Number F15-007045, on or about August 30, 2016; and

    (3) Possession of a Firearm, Weapon, or Ammunition by a Convicted Felon, in violation of Florida Statutes Section 790.23(1), in the County Court for the State of Florida, County of Miami-Dade, Case Number F20-004582, on or about August 4, 2020.

    When defendant knowingly and unlawfully possessed the firearms and ammunition described above, defendant knew that he had been convicted of these crimes, that each crime was punishable by imprisonment for a term exceeding one year, and that because of those convictions, it was illegal for him to possess any firearm or ammunition.

    Conspiracy to Commit Check Fraud and Aggravated Identity Theft

    Beginning no later than in or around May 10, 2021 and continuing through at least on or around March 31, 2022, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant conspired and agreed with others known and unknown, including Coconspirator 1 ("CC-1"), to execute a scheme to defraud federally insured financial institutions, including Bank 1 and Bank 2, Bank 3 and Bank 4, by manufacturing and depositing fraudulent checks to steal money from the banks. At all relevant times, defendant and his co-conspirators acted with the intent to defraud.

    As part of the scheme, defendant used the Instagram social media platform to urge Instagram followers to join his Telegram chat groups, where, for a fee, defendant provided instruction on how to commit check fraud to steal money from and otherwise defraud banks, including Bank 1, Bank 2, Bank 3 and Bank 4.  Using his Instagram

accounts and the Telegram chat groups, defendant would advertise that
for a fee of thousands of dollars, he would travel outside the state
of California to provide instruction on how to commit check fraud.
Using the Instagram accounts and the Telegram chat groups, defendant
would advertise that he would pay a fee to use third party accounts
for check fraud.  Defendant and his coconspirators would create
fraudulent checks drawn on victim accounts using stolen victim
information, including Personal Identifying Information ("PII").
Defendant's coconspirators, aided and abetted by defendant, would
deposit the fraudulent checks into third party accounts.  By
negotiating the fraudulent checks, defendant and his coconspirators
would falsely represent to the depository bank that the checks were
legitimate, causing the issuing bank to credit third party accounts
for the payments.  Once the check amounts were credited to third
party accounts, defendant's coconspirators, aided and abetted by
defendant, would make withdrawals electronically and in cash from the
third-party accounts, in dollar amounts intended to avoid triggering
scrutiny from the banks, and in dollar amounts below $10,000 in one
business day.

Additionally, with respect to Bank 1, the object of the
conspiracy was carried out as follows:  CC-1 was a teller and then a
concierge at Bank 1, and worked at Bank 1 at various locations within
in the Central District of California and had access to Bank 1's
electronic customer and account management system using CC-1's unique
employee identification number ("EID").  Defendant requested
information regarding customers at Bank 1 from CC-1.  CC-1 used CC-
1's position as a bank employee and CC-1's EID to access victim
account holder information on Bank 1's electronic customer and

account management system, including the accounts in the names of victims A.R., M. and Y.  CC-1 provided information from Bank 1's electronic customer and account management system to defendant, so that defendant and known and unknown coconspirators could create and successfully deposit fraudulent checks drawn on victim accounts -- including the accounts in the names of victims A.R., M. and Y. -- into third party accounts.  CC-1 provided this information knowing that CC-1 did not have authorization from Bank 1 or the victim account holders -- including victims A.R., M. and Y. -- to share that information.

By negotiating the fraudulent checks, defendant and his coconspirators falsely represented to the depository bank that the checks were legitimate, causing Bank 1 to credit third party accounts for the payments.  Once the check amounts were credited to third party accounts, defendant's coconspirators, aided and abetted by defendant, fraudulently withdrew money from the third-party accounts. CC-1 also took photographs of checks that were deposited at Bank 1 by account holders and transmitted them to defendant.  Defendant and his coconspirators paid CC-1 a portion of the resulting cash that the coconspirators obtained from negotiating the fraudulent checks.

Through this fraudulent scheme, with respect to Bank 1, defendant and his coconspirators attempted to deposit at least approximately $1,052,002.48 in fraudulent checks and stole at least approximately $339,026.32 from Bank 1.  With respect Bank 2, defendant and his coconspirators attempted to deposit at least approximately $131,815 in fraudulent checks and stole at least approximately $66,214 from Bank 2.

In furtherance of the conspiracy and to accomplish its objects, defendant, together with his coconspirators, including CC-1, on or about the dates set forth below, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

- On an unknown date, but no later than May 10, 2021, CC-1 agreed to provide defendant with information regarding account holders at Bank 1.

- On or about May 10, 2021, CC-1 accessed victim Y.'s account on Bank 1's customer and account management system.

- Between on or about May 10, 2021 and on or about May 14, 2021, CC-1 sent information regarding victim Y.'s account to defendant so that defendant and coconspirators could create and deposit fraudulent checks drawn on victim Y.'s account.

- On or about May 14, 2021, CC-1 accessed victim M.'s account on Bank 1's customer and account management system.

- On or about May 14, 2021, CC-1 sent information regarding victim M.'s account to defendant so that defendant and coconspirators could create and deposit fraudulent checks drawn on victim Y.'s account.

- On or about May 14, 2021, CC-1 attempted to assist a coconspirator at a Bank 1 branch in Los Angeles County, in the Central District of California, with cashing a fraudulent check drawn on victim Y.'s account for $4,100.78, that was rejected by Bank 1.

- On or about May 14, 2021, CC-1 assisted a coconspirator with depositing a fraudulent check drawn on victim M.'s account for $4,960.73 and a fraudulent check drawn on victim Y.'s

18

account for $4,100.78, totaling $9,061.51, at a Bank 1 branch in Los Angeles County, in the Central District of California.

- On or about May 21, 2021, a conspirator, K.J., paid CC-1 $500 using the Zelle payment application.

- On an unknown date, defendant, who was using Instagram handle "shootaswish59_," posted to his Instagram story two images of stacks of $100 bills and three Bank 1 deposit slips, two of which were dated May 21, 2021, with a caption advertising "aint even been 90 days home & I got [Bank 1] hot already."

- On or about June 7, 2021, a conspirator, S.J., paid CC-1 $500 using the Zelle payment application.

- On an unknown date, but no later than June 16, 2021, defendant sent a message to CC-1 on Telegram, with a partial photograph of a check and asked CC-1 to "[s]tart sending tho I'm tryna start making."  CC-1 responded that "I can't be on my phone like that bc my manager is watching . . . . You're going to make your money don't worry," to which defendant responded, "Banks close at 5[.]  I haven't printed nothing."

- On or about June 30, 2021, defendant, who was using Instagram handle "shootaswish59_," posted to his Instagram story "1K TO ENTER CHAT."

- On or about July 8, 2021, a conspirator, K.J., paid CC-1 $500 using the Zelle payment application.

- On or about August 2, 2021, a conspirator, S.J., paid CC-1 $360 using the Zelle payment application.

- On or about August 10, 2021, defendant, who was using Instagram handle "shootaswish59_," posted to his Instagram story an image of a Bank 1 deposit slip dated August 7, 2021,

1    and a Bank card not in defendant's name, containing the
2    caption "They gang banging [Bank 2], I simply flew back to
3    [Bank 1]."
4  - On or about August 11, 2021, defendant, who was using
5    Instagram handle "shootaswish59_," posted to his Instagram
6    story an image of a redacted [Bank 2] receipt dated July 12,
7    2021, listing a $7,000 check deposit into a bank account
8    under the name "M.," stating "New [Bank 2] drip no matter how
9    old 2500 on spot wanna learn dm for entry fee."
10  - On or about September 13 ,2021, the Instagram handle
11    "ranks.gusto" sent an Instagram message to defendant, who was
12    using Instagram handle "shootaswish95_," stating that banks
13    were "spit[ting] out" his "slips," and in response, defendant
14    told him what ink to use to print fraudulent checks.
15  - On or about September 14, 2021, the Instagram handle
16    "realstakksbee" sent an Instagram message to defendant, who
17    was using Instagram handle "shootaswish95_," asking defendant
18    "is there anything else I need besides the computer, printer
19    and Checkbuilder pro," to which defendant responded, "No
20    that's gucci."
21  - On or about September 14, 2021, a conspirator, Y.R., paid CC-
22    1 $300 using the Zelle payment application.
23  - On or about September 16, 2021, defendant sent CC-1 a text
24    message stating "U still aint sending nothing . . . this is
25    business n people complaining," to which CC-1 responded "I
26    GOT YOU. . . the girl goes to lunch I'll send them on tele .
27    . ."
28

- On or about September 16, 2021, the Instagram handle "bandhunta" sent an Instagram message to defendant, who was using Instagram handle "shootaswish95_," asking defendant to send checks from Bank 3, and "I'll promote you," to which defendant replied, "Promo first."

- On or about September 17, 2021, the Instagram handle "cheatcodegwap" sent an Instagram message to defendant, who was using Instagram handle "shootaswish95_," stating "Let's work fam . . . I got hella cards but my bank plug playing," to which defendant responded "Bank plug?  You got an inny?" and "cheatcodegwap" responded "Yup at a credit union that's how I get my food," to which defendant responded, "Get them on point."

- On or about September 17, 2021, the Instagram handle "rah.cash" sent an Instagram message to defendant, who was using Instagram handle "shootaswish95_," asking for the information "underneath the check number" for the last check defendant had posted on his Telegram chat group "Smoke Season."

- On or about September 22, 2021, defendant, who was using Instagram handle "shootaswish95_," sent an Instagram message to Instagram handle "g_wuzzo" stating that it cost $800 to join his chat.

- On or about September 27, 2021, defendant, who was using Instagram handle "shootaswish95_," sent an Instagram message to the Instagram handle "topfivekeyaa," instructing on what ink should be used to print fraudulent checks.

1      - On or about September 29, 2021, Instagram handle "cqkash"
2        sent an Instagram message to defendant, who was using
3        Instagram handle "shootaswish95_," stating "Got a [Bank 2]
4        Member since 2015," to which defendant replied "join chat n
5        I'll collab with u Ugonna make it right back. . . 500."
6      - On or about October 5, 2021, CC-1 texted defendant "I'm
7        helping another branch out And still looking at accounts," to
8        which defendant responded, "Send me pics m stuff."
9      - On or about October 6, 2021, CC-1 texted defendant " have
10       some good ones For you with balance I'm going to keep trying
11       . . . If my last resort is send em here & delete them."
12     - On or about October 20, 2021, defendant, who was using
13       Instagram handle "shootaswish95_," sent an Instagram message
14       to the Instagram handle "bhiebeaadhfadedff," stating that
15       joining the chat for "cooking classes" cost $500.
16     - On or about October 26, 2021, a conspirator, Y.R., paid CC-1
17       $500 using the Cash App payment application.
18     - On or about October 28, 2021, an unknown individual sent an
19       Instagram message to defendant, who was using Instagram
20       handle "shootaswish95_," asking for his "booking fee for
21       philly?" to which defendant responded, "5k 1500 deposit."  In
22       response, the unknown individual wrote, "[Bank 1] ya thing
23       rt?"
24     - On an unknown date but no later than November 2, 2021,
25       defendant, who was using Instagram handle "shootaswish95_,"
26       posted a story to Instagram with the following caption "Nov
27       2-5th Nov 8-12th, Nov 29 – dec 3rd . . . Sold out dates!  I'm
28       booked up.  But if u want turn yo self yo yo own boss, we

1  also give tutorials . . . all it costs is 500$ & I'll add u
2  to a chat that can change your life."
3  - On or about November 22, 2021, the Instagram handle
4  "shreem_loco823" sent an Instagram message to defendant, who
5  was using Instagram handle "shootaswish95_," asking for the
6  best "setty," before paying to join the chat, to which
7  defendant responded with the name of a check design software.
8  - On or about November 22, 2021, Instagram handle "moe_2x" sent
9  an Instagram message to defendant, who was using Instagram
10  handle "shootaswish95_," asking if defendant "got some
11  business slips for [Bank 4]?" to which defendant responded,
12  "U got 300 . . .?"
13  - On or about November 23, 2021, a conspirator, Y.R., paid CC-1
14  $100 using the Zelle payment application.
15  - On or about December 2, 2021, defendant, who was using
16  Instagram handle "shootaswish95_," posted a story posted an
17  Instagram story that included an exchange with CC-1, with the
18  caption "Tap in w me if you got [Bank 2] or [Bank 1]
19  Certified 20k a week."]
20  - On or about December 5, 2021, a conspirator, Y.R., paid CC-1
21  $400 using the Cash App payment application.
22  - On or about December 8, 2021, defendant, using his company
23  Swish Entertainment Inc., paid CC-1 $400 using the Zelle
24  payment application.
25  - On or about December 14, 2021, defendant who was who was
26  using Instagram handle "shootaswish95_," sent an Instagram
27  message to Instagram handle "apollosway" stating that
28  defendant had switched to a new Telegram chat group because

"Some weird shit was going on some now we can call n verify
ask . . . on ft if they law enforcement."

- On or about December 17, 2021, Instagram handle "yfn_ashlet"
  sent an Instagram message to defendant who was using
  Instagram handle "shootaswish95_," asking whether
  "yfn_ashlet" could buy Bank 1 checks through defendant's
  Telegram chat when he joined, to which defendant responded,
  "Yea they sell."
- On an unknown date but no later than December 31, 2021,
  defendant, who was using Instagram handle "shootaswish95_,"
  posted a story to Instagram with the following text "& just
  like that I'm boutta book up for the rest of the year . . .
  Fl cost a lil more, I got bad luck there when it comes to the
  police but for the right price I'll make a way."
- On an unknown date, defendant, who was using Instagram handle
  "shootaswish95_," posted a story to Instagram with the
  following text "The plastic not enough when I got ppl booking
  me to fly in & get them rich."
- On or about January 18, 2021, a conspirator, Y.R., paid CC-1
  $500 using the Zelle payment application.
- On or about January 21, 2021, a conspirator, Y.R., paid CC-1
  $500 using the Zelle payment application.
- On or about February 11, 2022, defendant who was using
  Instagram handle "shootaswish95_" posted to his story on
  Instagram "IF YOU WANNA JOIN CHAT OR WANNA COLLAB THIS WEEK
  MUST BE A [Bank 2] OA or [Bank 1]!"
- On or about February 17, 2022, defendant texted CC-1 "Let's
  another 50 1500 vybez."

24

- On an unknown date defendant and coconspirators printed two
  fraudulent checks, each in the amount of $13,850, each dated
  February 17, 2022, with victim AVC Corporation listed as the
  payor, with AVC Corporation's real bank account number at
  Bank 2 listed as the payor account, made out to a third-
  party, M.B.
- On or about March 2, 2022, coconspirators attempted to
  deposit a total of five fraudulent checks, each in the amount
  of $13,850, totaling $69,250, each dated February 17, 2022,
  with victim AVC Corporation listed as the payor, with AVC
  Corporation's real bank account number at Bank 2 listed as
  the payor account, with one of them made out to a third-
  party, M.B.
- On or about March 8, 2022, Instagram handle "daewop" sent an
  Instagram message to defendant who was using
  "shootaswish95_," stating "I got slip innies too," to which
  defendant responded, "I neeeeddd Weee can def lock in on
  that," and "daewop" responded "its good I got ah few diff
  innies and im working on getting sum keys."
- On or about March 10, 2022, Instagram handle "lantana_kb"
  sent an Instagram message to defendant, who was using
  "shootaswish95_," stating "got cash for the slip," to which
  defendant responded that there "is a line For the food."
- On or about March 16, 2022, CC-1 accessed victim A.R.'s
  account on Bank 1's customer and account management system.
- Between on or about March 16, 2022 and on or about March 17,
  2022, CC-1 sent information regarding victim A.R.'s account
  to defendant so that defendant and coconspirators could

create and deposit fraudulent checks drawn on victim A.R.'s
account.

- On or about March 17, 2022, defendant aided and abetted a
  coconspirator wearing a face mask and medical scrubs in
  depositing a $12,445 fraudulent check drawn on victim A.R.'s
  account into M.C.'s account, at a Bank 1 branch in
  Bakersfield, California.
- On or about March 17, 2022, defendant aided and abetted a
  coconspirator in depositing a $12,986 fraudulent check drawn
  on victim A.R.'s account into S.F.'s account, at a Bank 1
  branch in Bakersfield, California.
- On or about March 18, 2022, a coconspirator made $5,000 in
  cash withdrawals from M.C.'s account, into which the $12,445
  fraudulent check had been deposited, in the following
  increments:  $3,500 from a teller inside a Bank 1 branch in
  Reseda, Los Angeles County, in the central District of
  California, followed by a $1,500 withdrawal from an ATM
  located outside the same bank branch.
- On or about March 18, 2022, a coconspirator made a $2,500
  Zelle withdrawal from S.F.'s account, into which the $12,986
  fraudulent check had been deposited.
-  On or about March 18, 2022, a coconspirator made multiple
  debit and cash withdrawals totaling over $4,000 in Fort
  Lauderdale, Florida from S.F.'s account, into which the
  $12,986 fraudulent check had been deposited.
- On or about March 21, 2022, a coconspirator made a $2,500
  Zelle withdrawal from S.F.'s account, into which the $12,986
  fraudulent check had been deposited.

- On or about March 25, 2022, defendant aided and abetted coconspirators in depositing multiple fraudulent checks into third-party accounts at Bank 2 branches in the District of Arizona.

- On an unknown date, but no later than March 28, 2022, within the WINNING OUR ONLY OPTION Telegram chat group, coconspirators circulated links to illicit websites for obtaining stolen victim PII.

- On or about March 28, 2022, at a residence in Orange County, within the Central District of California, defendant and a coconspirator knowingly possessed approximately 677 stolen and/or counterfeit checks.  Two checks were stolen United States Treasury checks, including one issued by the United States Government, Internal Revenue Service ("IRS") to an individual victim, A.R.G.  Four checks were stolen checks made payable to the United States Treasury by individual victims, including two checks made out to the United States Treasury by individual victims, M.K. and B.A.N.R., in connection with 2021 federal taxes owed.  As a result of the theft, victim M.K. was assessed a penalty by the IRS.

- On March 28, 2022, at a residence in Orange County, within the Central District of California, defendant and a coconspirator knowingly possessed approximately fourteen stolen money orders not in the name of defendant or the coconspirator, the residents, with a total value of $3,596.70.

- On March 29, 2022, while detained at Metropolitan Detention Center ("MDC"), defendant instructed a coconspirator to

27

1    withdraw $20,000, in separate transactions of $3,000 each,

2    and not more than $10,000 a day, and instructed another

3    coconspirator to continue to "run the operation" which

4    defendant said generates $150,000 a month.

5    - On or about March 30, 2022, while detained at MDC, defendant

6      instructed a coconspirator to locate and reach out to CC-1.

7    - On or about March 31, 2022, while detained at MDC, defendant

8      instructed a coconspirator to locate and reach out to CC-1,

9      to send money to a coconspirator CC-1 via CashApp, and to

10     send money with a message to call defendant.

11                          *        *        *

12   Based on the losses to Bank 1 and Bank 2, and the stolen money

13   orders, and the victim AVC checks, the current estimated total actual

14   loss amount associated with defendant's check fraud scheme is at

15   least approximately $408,837.02.  The current estimated total

16   intended loss amount associated with the check fraud scheme is at

17   least $1,256,664.18.

18   <u>Scheme to Commit EDD and Bank Fraud and Aggravated Identity Theft</u>

19   In 2021, defendant and others knowingly and with intent to

20   defraud, executed a scheme to deceive and cheat and obtain money from

21   California Employment Development Department ("EDD") which

22   administered unemployment insurance ("UI") benefits for residents of

23   California, including Pandemic Unemployment Assistance benefits to

24   individuals who were unemployed because of the COVID-19 pandemic

25   ("pandemic benefits"), and Bank of America, NA ("Bank of America"), a

26   financial institution that was insured by the Federal Deposit

27   Insurance Company, by means of material false and fraudulent

28

1  pretenses, representations, and promises, and the concealment of

2  material facts.

3       As part of their fraudulent scheme, co-schemers would obtain

4  stolen personal identifying information ("PII") of third-parties,

5  including on dark web internet websites, and a co-schemer would

6  maintain that victim PII in notebook ledgers and other locations.

7  Co-schemers would use the victims' PII to submit fraudulent online

8  applications to EDD for UI benefits, including pandemic benefits (the

9  "fraudulent EDD applications").  Defendant and co-schemers would

10 assume the victims' identities and use the victims' PII to provide

11 materially false information to EDD on the fraudulent EDD

12 applications, including to certify to EDD under the penalties of

13 perjury that that the alleged applicants were residents of California

14 who were unemployed as a direct result of the COVID-19 pandemic.  The

15 alleged applicants included individuals who resided outside the state

16 of California or were deceased, or who were otherwise not eligible

17 for UI benefits, including pandemic benefits.  Co-schemers would

18 provide EDD with a set of common mailing addresses for multiple

19 applications, that they controlled.

20      By submitting the fraudulent EDD applications, defendant and his

21 co-schemers would cause EDD to:  authorize pandemic benefits to be

22 provided to individuals who were ineligible for pandemic benefits,

23 including individuals who were ineligible for pandemic benefits

24 because they resided outside the state of California, or were

25 deceased; create a debit accounts ("EDD debit accounts") with Bank of

26 America, NA ("Bank of America") in the names of third parties; and

27 cause debit cards linked to the EDD debit accounts at Bank of America

28 ("EDD debit cards"), to be mailed to mailing addresses listed by the

coconspirators on the applications, which the co-schemers had access to and controlled.

After EDD approved the fraudulent EDD applications and disbursed the pandemic benefits funds to the EDD debit accounts, and Bank of America issued the EDD debit cards linked to those accounts, defendant and his co-schemers would fraudulently assume the identities of the EDD debit account holders and use the corresponding EDD debit cards to make fraudulent cash withdrawals of pandemic benefits from ATMs in Los Angeles and Orange Counties in the Central District of California, as well as San Diego County in the Southern District of California, and Maricopa County in the District of Arizona, including at ATMs that Bank of America operated.

Among other things, during the course of the scheme, on or about July 12, 2021, co-schemers electronically filed an application for pandemic benefits in the name of I.S., an out-of-state resident, which was approved by EDD, using I.S.'s PII contained in a co-schemer's ledgers.  The application claimed that I.S. was "Laid Off/No Work" on July 10, 2021.  I.S. has no record of employment in California with EDD at any time from 2018 through the July 2022, and had an out-of-state driver's license from 2017 through the present.

On or about August 14, 2021, a co-schemer, using an EDD debit card ending in 6067, issued in the name of victim I.S., withdrew $1,000 from a Bank of America ATM in North Hollywood, Los Angeles County, which is in the Central District of California.  On or about August 15, 2021, a co-schemer, using an EDD debit card ending in 6067, issued in the name of I.S., withdrew $1,000 from a Bank of America ATM in North Hollywood, Los Angeles County, which is in the Central District of California.  On or about August 18, 2021,

defendant, using an EDD debit card ending in 6067, issued in the name of I.Z.S., withdrew $1,000 from a Bank of America ATM in Irvine, Orange County, which is in the Central District of California.  In total, $14,250 in fraudulent unemployment benefits were issued in connection with the EDD debit card in the name of I.S., leading to $14,250 in actual losses to EDD.

                          *     *     *

### Total Fraud Losses

    Accordingly, the current estimated total intended loss amount from both fraud schemes is at least approximately $1,270,914.18, the total actual loss amount from both fraud schemes is at least approximately $423,087.02.  Victims of defendant's fraudulent schemes include Bank 1, Bank 2, A.R., M., Y., L.M., A.R.G., M.M.K., B.A.N.R., K.R., corporate victim S.L., EDD, Bank of America and I.S.

### SENTENCING FACTORS

    14.  Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crimes of conviction.

15. Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

Counts One and Two:

| | | |
|---|---|---|
| Base Offense Level: | 22 | U.S.S.G. § 2K2.1(a)(3) |
| Specific Offense Characteristics | | |
| Three to Seven Firearms | +2 | 2K2.1(b)(1)(A) |

Count Three:

| | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(A)(1) |
| Specific Offense Characteristics | | |
| Loss between $550,000 and $1,500,000 | +14 | U.S.S.G. § 2B1.1(b)(1)(H) |
| Ten or more victims | +2 | U.S.S.G. § 2B1.1(b)(2) |
| Sophisticated means | +2 | U.S.S.G. § 2B1.1(b)(10) |
| Trafficking of unauthorized access devices | +2 | U.S.S.G. § 2B1.1(b)(11) |

The USAO will agree to a two-level downward adjustment for acceptance of responsibility (and, if applicable, move for an additional one-level downward adjustment under U.S.S.G. § 3E1.1(b)) only if the conditions set forth in paragraph 3(d) are met and if defendant has not committed, and refrains from committing, acts constituting obstruction of justice within the meaning of U.S.S.G. § 3C1.1, as discussed below.  Subject to paragraph 30 below, defendant and the USAO agree not to seek, argue, or suggest in any way, either orally or in writing, that any other specific offense characteristics, adjustments, or departures relating to the offense level be imposed. Defendant agrees, however, that if, after signing this agreement but

prior to sentencing, defendant were to commit an act, or the USAO were to discover a previously undiscovered act committed by defendant prior to signing this agreement, which act, in the judgment of the USAO, constituted obstruction of justice within the meaning of U.S.S.G. § 3C1.1, the USAO would be free to seek the enhancement set forth in that section and to argue that defendant is not entitled to a downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1.  The base offense level set forth above in relation to Counts One and Two is based on information currently known to the government regarding defendant's criminal history.  Defendant understands and agrees that defendant's base offense level could be increased if defendant is a career offender under U.S.S.G. §§ 4B1.1 and 4B1.2 or an armed career criminal under U.S.S.G. §§ 4B1.4 and 18 U.S.C. § 924(e), or if defendant has additional prior conviction(s) for either a crime of violence or a controlled substance offense under U.S.S.G. § 2K2.1.  If defendant's base offense level is so altered, defendant and the USAO will not be bound by the base offense level agreed to above or the agreement to Sentencing Guideline factors set forth above.

16.  Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

17.  Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

18.  Defendant understands that by pleading guilty, defendant gives up the following rights:

33

1    a. The right to persist in a plea of not guilty.

2    b. The right to a speedy and public trial by jury.

3    c. The right to be represented by counsel -- and if

4 necessary have the Court appoint counsel -- at trial.  Defendant

5 understands, however, that, defendant retains the right to be

6 represented by counsel -- and if necessary have the Court appoint

7 counsel -- at every other stage of the proceeding.

8    d. The right to be presumed innocent and to have the

9 burden of proof placed on the government to prove defendant guilty

10 beyond a reasonable doubt.

11    e. The right to confront and cross-examine witnesses

12 against defendant.

13    f. The right to testify and to present evidence in

14 opposition to the charges, including the right to compel the

15 attendance of witnesses to testify.

16    g. The right not to be compelled to testify, and, if

17 defendant chose not to testify or present evidence, to have that

18 choice not be used against defendant.

19    h. Any and all rights to pursue any affirmative defenses,

20 Fourth Amendment or Fifth Amendment claims, and other pretrial

21 motions that have been filed or could be filed.

22       WAIVER OF RETURN OF DIGITAL DATA

23   19.  Understanding that the government has in its possession

24 digital devices and/or digital media seized from defendant, defendant

25 waives any right to the return of digital data contained on those

26 digital devices and/or digital media and agrees that if any of these

27 digital devices and/or digital media are returned to defendant, the

government may delete all digital data from those digital devices and/or digital media before they are returned to defendant.

<u>WAIVER OF APPEAL OF CONVICTION</u>

20.  Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty pleas were involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's convictions on the offenses to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's pleas of guilty.

<u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE AND COLLATERAL ATTACK</u>

21.  Defendant agrees that, provided the Court imposes a term of imprisonment within or below the range corresponding to an offense level of 26 and the criminal history category calculated by the Court, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the amount and terms of any restitution order, provided it requires payment of no more than $423,087.02; (f) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (g) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in the Second

Amended General Order 20-04 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

22.   The USAO agrees that, provided (a) all portions of the sentence are at or below the statutory maximum specified above and (b) the Court imposes a term of imprisonment within or above the range corresponding to an offense level of 26 and the criminal history category calculated by the Court, the USAO gives up its right to appeal any portion of the sentence, with the exception that the USAO reserves the right to appeal the following:  the amount of restitution ordered if that amount is less than $423,087.02.

23.   Defendant also gives up any right to bring a post-conviction collateral attack on the convictions or sentence, including any order of restitution, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or an explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction.  Defendant understands that these waivers include, but are not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's pleas of guilty.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEAS</u>

24.   Defendant agrees that if, after entering guilty pleas pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty pleas on any basis other than a claim and finding that entry into this plea agreement was

involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement; and (b) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

<u>RESULT OF VACATUR, REVERSAL OR SET-ASIDE</u>

25.  Defendant agrees that if any count of conviction is vacated, reversed, or set aside, the USAO may: (a) ask the Court to resentence defendant on any remaining count of conviction, with both the USAO and defendant being released from any stipulations regarding sentencing contained in this agreement, (b) ask the Court to void the entire plea agreement and vacate defendant's guilty plea on any remaining count of conviction, with both the USAO and defendant being released from all their obligations under this agreement, or (c) leave defendant's remaining conviction, sentence, and plea agreement intact.  Defendant agrees that the choice among these three options rests in the exclusive discretion of the USAO.

<u>EFFECTIVE DATE OF AGREEMENT</u>

26.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

## BREACH OF AGREEMENT

27.   Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered guilty pleas pursuant to this agreement, defendant will not be able to withdraw the guilty pleas, and (b) the USAO will be relieved of all its obligations under this agreement.

28.   Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

      a.   Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

      b.   Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

1          c.    Defendant agrees that: (i) any statements made by

2   defendant, under oath, at the guilty plea hearing (if such a hearing

3   occurred prior to the breach); (ii) the agreed to factual basis

4   statement in this agreement; and (iii) any evidence derived from such

5   statements, shall be admissible against defendant in any such action

6   against defendant, and defendant waives and gives up any claim under

7   the United States Constitution, any statute, Rule 410 of the Federal

8   Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal

9   Procedure, or any other federal rule, that the statements or any

10  evidence derived from the statements should be suppressed or are

11  inadmissible.

12          COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

13                        OFFICE NOT PARTIES

14       29.    Defendant understands that the Court and the United States

15  Probation and Pretrial Services Office are not parties to this

16  agreement and need not accept any of the USAO's sentencing

17  recommendations or the parties' agreements to facts or sentencing

18  factors.

19       30.    Defendant understands that both defendant and the USAO are

20  free to: (a) supplement the facts by supplying relevant information

21  to the United States Probation and Pretrial Services Office and the

22  Court, (b) correct any and all factual misstatements relating to the

23  Court's Sentencing Guidelines calculations and determination of

24  sentence, and (c) argue on appeal and collateral review that the

25  Court's Sentencing Guidelines calculations and the sentence it

26  chooses to impose are not error, although each party agrees to

27  maintain its view that the calculations in paragraph 15 are

28  consistent with the facts of this case.  While this paragraph permits

                                   39

both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

31. Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty pleas, and defendant will remain bound to fulfill all defendant's obligations under this agreement. Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

//
//
//
//
//
//
//
//
//
//

<u>NO ADDITIONAL AGREEMENTS</u>

32.   Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

<u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

33.   The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.


AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

JOSEPH MCNALLY
Attorney for the United States,
Acting Under Authority Conferred by
28 U.S.C. § 515
United States Attorney

RACHEL AGRESS   Digitally signed by RACHEL AGRESS
Date: 2023.05.11 14:42:06 -07'00'
_____          _____
RACHEL N. AGRESS                            Date
DAVID PI
Assistant United States Attorneys

_____          4/20/23
MESHACH SAMUELS                             Date
Defendant

_____          4/20/23
VICTOR SHERMAN                              Date
Attorney for Defendant
MESHACH SAMUELS

1        CERTIFICATION OF DEFENDANT

2        I have read this agreement in its entirety.  I have had enough

3   time to review and consider this agreement, and I have carefully and

4   thoroughly discussed every part of it with my attorney.  I understand

5   the terms of this agreement, and I voluntarily agree to those terms.

6   I have discussed the evidence with my attorney, and my attorney has

7   advised me of my rights, of possible pretrial motions that might be

8   filed, of possible defenses that might be asserted either prior to or

9   at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

10  of relevant Sentencing Guidelines provisions, and of the consequences

11  of entering into this agreement.  No promises, inducements, or

12  representations of any kind have been made to me other than those

13  contained in this agreement.  No one has threatened or forced me in

14  any way to enter into this agreement.  I am satisfied with the

15  representation of my attorney in this matter, and I am pleading

16  guilty because I am guilty of the charge and wish to take advantage

17  of the promises set forth in this agreement, and not for any other

18  reason.

19  _____          4/20/23
    MESHACH SAMUELS                      Date
20  Defendant

21

22        CERTIFICATION OF DEFENDANT'S ATTORNEY

23        I am MESHACH SAMUELS's attorney.  I have carefully and

24  thoroughly discussed every part of this agreement with my client.

25  Further, I have fully advised my client of his rights, of possible

26  pretrial motions that might be filed, of possible defenses that might

27  be asserted either prior to or at trial, of the sentencing factors

28  set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

                                41

provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is informed and voluntary; and the factual basis set forth in this agreement is sufficient to support my client's entry of guilty pleas pursuant to this agreement.

_____     _____
VICTOR SHERMAN                                         Date

Attorney for Defendant
MESHACH SAMUELS

# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ED CR No. 8:22-cr-00030(A)-CJC |
|---|---|
| Plaintiff, | F I R S T S U P E R S E D I N G I N F O R M A T I O N |
| v. | |
| MESHACH SAMUELS, aka "Meshack Samuels," aka "Meshac Samuels," aka "Adrian Samuels," aka "Carl Bencillion," aka "Carl Bensheley," aka "shootaswish95_," aka "shootaswish59_," aka "shootaswish59__," aka "WINNING OUR ONLY OPTION," aka "helpthehelp_," aka "Smokeeee Seasonn," aka "Swish Entertainment Inc.," | [18 U.S.C. § 922(g)(1): Felon in Possession of Firearms and Ammunition; 18 U.S.C. § 1349: Conspiracy to Commit Bank Fraud; 18 U.S.C. § 924(d)(1), 18 U.S.C. § 982, 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| Defendant. | |

The United States Attorney charges:

COUNT ONE

[18 U.S.C. § 922(g)(1)]

On or about August 29, 2021, in Orange County, within the Central District of California, defendant MESHACH SAMUELS, also known as ("aka") "Meshack Samuels," aka "Meshac Samuels," aka "Adrian

Samuels," aka "Carl Bencillion," aka "Carl Bensheley," aka
"shootaswish95_," aka "shootaswish59_," aka "shootaswish59__," aka
"WINNING OUR ONLY OPTION," aka "helpthehelp_," aka "Smokeeee
Seasonn," aka "Swish Entertainment Inc.," knowingly possessed a
firearm, namely, a Ruger, Model LCP, .380 caliber semi-automatic
pistol, bearing serial number 374-81336, and ammunition, namely, four
rounds of Remington Arms .380 automatic caliber ammunition, in and
affecting interstate and foreign commerce.

Defendant SAMUELS possessed such firearm and ammunition knowing
that he had previously been convicted of at least one of the
following felony crimes, each punishable by a term of imprisonment
exceeding one year:

1.   Aggravated Battery on a Law Enforcement Officer, in
violation of Florida Statutes Section 784.07(2)(d), with enhancements
for Attempted Murder of a Law Enforcement Officer and Aggravated
Battery, in violation of Florida Statutes Sections 782.065, 777.04,
775.0823 and 775.087, in the County Court for the State of Florida,
County of Miami-Dade, Case Number F15-007045, on or about August 30,
2016;

2.   Fleeing or Attempting to Elude a Law Enforcement Officer,
in violation of Florida Statute Section 316.1935(1), in the County
Court for the State of Florida, County of Miami-Dade, Case Number
F15-007045, on or about August 30, 2016; and

3.   Possession of a Firearm, Weapon, or Ammunition by a
Convicted Felon, in violation of Florida Statutes Section 790.23(1),
in the County Court for the State of Florida, County of Miami-Dade,
Case Number F20-004582, on or about August 4, 2020.

1                              COUNT TWO

2                        [18 U.S.C. § 922(g)(1)]

3        On or about March 28, 2022, in Orange County, within the Central

4   District of California, defendant MESHACH SAMUELS, also known as

5   ("aka") "Meshack Samuels," aka "Meshac Samuels," aka "Adrian

6   Samuels," aka "Carl Bencillion," aka "Carl Bensheley," aka

7   "shootaswish95_," aka "shootaswish59_," aka "shootaswish59__," aka

8   "WINNING OUR ONLY OPTION," aka "helpthehelp_," aka "Smokeeee

9   Seasonn," knowingly possessed firearms, namely, a Glock Model 19X,

10  9mm caliber pistol, bearing serial number BTRE485, a Sarsilmaz Model

11  SAR 9, 9mm caliber pistol, bearing serial number T1102-20BV72714, a

12  Taurus Model G2C, 9mm caliber pistol, bearing serial number

13  ABG731850, a Springfield Armory Model XD-40, .40 caliber pistol,

14  bearing serial number MG340367, and a SCCY Industries model CPX-2,

15  9mm caliber pistol, bearing serial number 896882, in and affecting

16  interstate and foreign commerce.

17       Defendant SAMUELS possessed such firearms knowing that he had

18  previously been convicted of at least one of the following felony

19  crimes, each punishable by a term of imprisonment exceeding one year:

20       1.   Aggravated Battery on a Law Enforcement Officer, in

21  violation of Florida Statutes Section 784.07(2)(d), with

22  enhancements for Attempted Murder of a Law Enforcement Officer and

23  Aggravated Battery, in violation of Florida Statutes Sections

24  782.065, 777.04, 775.0823 and 775.087, in the County Court for the

25  State of Florida, County of Miami-Dade, Case Number F15-007045, on

26  or about August 30, 2016;

27       2.   Fleeing or Attempting to Elude a Law Enforcement Officer,

28  in violation of Florida Statute Section 316.1935(1), in the County

                                    3

Court for the State of Florida, County of Miami-Dade, Case Number F15-007045, on or about August 30, 2016; and

3.   Possession of a Firearm, Weapon, or Ammunition by a Convicted Felon, in violation of Florida Statutes Section 790.23(1), in the County Court for the State of Florida, County of Miami-Dade, Case Number F20-004582, on or about August 4, 2020.

1                                    COUNT THREE

2                                [18 U.S.C. § 1349]

3  A.   INTRODUCTORY ALLEGATIONS

4        At times relevant to this First Superseding Information:

5         1.  Defendant MESHACH SAMUELS, also known as ("aka") "Meshack

6  Samuels," aka "Meshac Samuels," aka "Adrian Samuels," aka "Carl

7  Bencillion," aka "Carl Bensheley," aka "shootaswish95_," aka

8  "shootaswish59_," aka "shootaswish59__," aka "WINNING OUR ONLY

9  OPTION," aka "helpthehelp_," aka "Smokeeee Seasonn," was a resident

10 in Los Angeles and Orange Counties, within the Central District of

11 California.

12        2.   Instagram was a globally accessible social media

13 application, providing a platform for sharing photographs, videos and

14 other messages, instant messaging service, and video calling, among

15 other features.

16        3.   Defendant SAMUELS had numerous Instagram profile "handles"

17 including "shootaswish59_," "shootaswish95_," and "shootaswish59__"

18 (collectively, "the Instagram accounts").

19        4.   Telegram was a globally accessible application that

20 provided an instant messaging service, optional end-to-end encrypted

21 chats, and video calling, among other features.

22        5.   Defendant SAMUELS hosted and participated in numerous chat

23 groups on the Telegram application, including "WINNING OUR ONLY

24 OPTION," "helpthehelp_," and "Smokeeee Seasonn" ("the Telegram

25 chatgroups").

26        6.   Bank 1, Bank 2, and Bank 3 were financial institutions that

27 were insured by the Federal Deposit Insurance Corporation ("FDIC").

28

                                       5

7.   Bank 4 was a financial institution insured by the National Credit Union Share Insurance Fund.

8.   Coconspirator 1 ("CC-1") was a teller and then a concierge at Bank 1, and worked at Bank 1 at various locations within in the Central District of California and had access to Bank 1's electronic customer and account management system using CC-1's unique employee identification number ("EID").

9.   Victim A.R. had a bank account at Bank 1 (the "A.R. account").

10.  Victim M. had a bank account at Bank 1 (the "M. account").

11.  Victim Y. had a bank account at Bank 1 (the "Y. account").

12.  A third party, M.C., had a bank account at Bank 1 (the "M.C. account").

13.  A third party, S.F., had a bank account at Bank 1 (the "S.F. account").

B.   THE OBJECT OF THE CONSPIRACY

14.  Beginning on an unknown date, but no later than on or about May 10, 2021, and continuing through at least on or about March 31, 2022, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendant SAMUELS and coconspirators, including CC-1, and others known and unknown to the United States Attorney, conspired with one another to commit bank fraud, in violation of Title 18, United States Code, Section 1344(1).

C.   MANNER AND MEANS OF THE CONSPIRACY

15.  The object of the conspiracy was carried out, and was to be carried out, in substance, in the following manner:

a.   Using the Instagram accounts, defendant SAMUELS would post publicly, using coded language to urge Instagram followers to

6

1  join his Telegram chat groups, where, for a fee, defendant SAMUELS

2  would provide instruction on how to commit check fraud to steal money

3  from and otherwise defraud banks, including Bank 1, Bank 2, Bank 3

4  and Bank 4.

5          b.   Using the Instagram accounts and the Telegram chat

6  groups, defendant SAMUELS would advertise that, for a fee of

7  thousands of dollars, he would travel outside the state of California

8  to provide instruction on how to commit check fraud.

9          c.   Using the Instagram accounts and the Telegram chat

10  groups, defendant SAMUELS would advertise that he would pay a fee to

11  use third party accounts for check fraud.

12          d.   Defendant SAMUELS and coconspirators would create

13  fraudulent checks drawn on victim accounts using stolen victim

14  information, including Personal Identifying Information ("PII").

15          e.   Defendant SAMUELS' coconspirators, aided and abetted

16  by defendant SAMUELS, would deposit the fraudulent checks into third

17  party accounts.  By negotiating the fraudulent checks, defendant

18  SAMUELS and coconspirators would falsely represent to the depository

19  bank that the checks were legitimate, causing the issuing bank to

20  credit third party accounts for the payments.

21          f.   Once the check amounts were credited to third party

22  accounts, defendant SAMUELS' coconspirators, aided and abetted by

23  defendant SAMUELS, would make withdrawals electronically and in cash

24  from the third-party accounts, in dollar amounts intended to avoid

25  triggering scrutiny from the banks, and in dollar amounts below

26  $10,000 in one business day.

27

28

1      g.    Additionally, with respect to Bank 1, the objects of

2  the conspiracy were carried out, and were to be carried out, in

3  substance, as follows:

4          i.    Defendant SAMUELS would request information

5  regarding customers at Bank 1 from CC-1.

6          ii.   CC-1 would use CC-1's position as a bank employee

7  and CC-1's EID to access victim account holder information on Bank

8  1's electronic customer and account management system, including the

9  accounts in the names of victims A.R., M., and Y.

10         iii. CC-1 would provide information from Bank 1's

11  electronic customer and account management system to defendant

12  SAMUELS, so that defendant SAMUELS and known and unknown

13  coconspirators could create and successfully deposit fraudulent

14  checks drawn on victim accounts-- including the accounts in the names

15  of victims A.R., M., and Y. -- into third party accounts.  CC-1 would

16  provide this information knowing that CC-1 did not have authorization

17  from Bank 1 or the victim account holders -- including victims A.R.,

18  M., and Y. -- to share that information.

19         iv.   By negotiating the fraudulent checks, defendant

20  SAMUELS and coconspirators would falsely represent to the depository

21  bank that the checks were legitimate, causing Bank 1 to credit third

22  party accounts for the payments.  Once the check amounts were

23  credited to third party accounts, defendant SAMUELS' coconspirators,

24  aided and abetted by defendant SAMUELS, would fraudulently withdraw

25  money from the third-party accounts.

26         v.    CC-1 would take photographs of checks that were

27  deposited at Bank 1 by account holders and transmit them to defendant

28  SAMUELS.

1          vi.   Defendant SAMUELS and coconspirators would pay

2    CC-1 a portion of the resulting cash that the coconspirators obtained

3    from negotiating the fraudulent checks.

4          h.   In total, through this fraudulent scheme, defendant

5    SAMUELS and his coconspirators attempted to deposit at least

6    approximately $1,253,067.48 in fraudulent checks and stole at least

7    approximately $405,240.32 from federally insured banks.

8    D.   OVERT ACTS

9    16. On or about the following dats, in furtherance of the

10   conspiracy and to accomplish its object, defendant SAMUELS, CC-1,

11   and other coconspirators, known and unknown, committed and willfully

12   caused others to commit, the following overt acts, among others,

13   within the Central District of California, and elsewhere:

14   Overt Act No. 1:   On an unknown date, but no later than May

15   10, 2021, CC-1 agreed to provide defendant SAMUELS with information

16   regarding account holders at Bank 1.

17   Overt Act No. 2:   On May 10, 2021, CC-1 accessed victim Y.'s

18   account on Bank 1's customer and account management system.

19   Overt Act No. 3:   Between May 10, 2021 and May 14, 2021, CC-1

20   sent information regarding victim Y.'s account to defendant SAMUELS

21   so that defendant SAMUELS and coconspirators could create and deposit

22   fraudulent checks drawn on victim Y.'s account.

23   Overt Act No. 4:   On May 14, 2021, CC-1 accessed victim M.'s

24   account on Bank 1's customer and account management system.

25   Overt Act No. 5:   On May 14, 2021, CC-1 sent information

26   regarding victim M.'s account to defendant SAMUELS so that defendant

27   SAMUELS and coconspirators could create and deposit fraudulent checks

28   drawn on victim Y.'s account.

<u>Overt Act No. 6:</u>   On May 14, 2021, CC-1 attempted to assist a coconspirator at a Bank 1 branch in Los Angeles County, with cashing a fraudulent check drawn on victim Y.'s account for $4,100.78, that was rejected by Bank 1.

<u>Overt Act No. 7:</u>   On May 14, 2021, CC-1 assisted a coconspirator with depositing a fraudulent check drawn on victim M.'s account for $4,960.73 and a fraudulent check drawn on victim Y.'s account for $4,100.78, totaling $9,061.51, at a Bank 1 branch in Los Angeles County.

<u>Overt Act No. 8:</u>   On May 21, 2021, a conspirator, K.J., paid CC-1 $500 using the Zelle payment application.

<u>Overt Act No. 9:</u>   On an unknown date, defendant SAMUELS, who was using Instagram handle "shootaswish59_," posted to his Instagram story two images of stacks of $100 bills and three Bank 1 deposit slips, two of which were dated May 21, 2021, with a caption stating "aint even been 90 days home & I got [Bank 1] hot already."

<u>Overt Act No. 10:</u>   On June 7, 2021, a conspirator, S.J., paid CC-1 $500 using the Zelle payment application.

<u>Overt Act No. 11:</u>   On an unknown date, but no later than June 16, 2021, defendant SAMUELS sent a message to CC-1 on Telegram, with a partial photograph of a check and asked CC-1 to "[s]tart sending tho I'm tryna start making."  CC-1 responded that "I can't be on my phone like that bc my manager is watching . . . . You're going to make your money don't worry," to which defendant SAMUELS responded, "Banks close at 5[.]  I haven't printed nothing."

<u>Overt Act No. 12:</u>   On June 30, 2021, defendant SAMUELS, who was using Instagram handle "shootaswish59_," posted to his Instagram story "1K TO ENTER CHAT."

1      <u>Overt Act No. 13:</u>   On July 8, 2021, a conspirator, K.J., paid
2  CC-1 $500 using the Zelle payment application.

3      <u>Overt Act No. 14:</u>   On August 2, 2021, a conspirator, S.J., paid
4  CC-1 $360 using the Zelle payment application.

5      <u>Overt Act No. 15:</u>   On August 10, 2021, defendant SAMUELS, who
6  was using Instagram handle "shootaswish59_," posted to his Instagram
7  story an image of a Bank 1 deposit slip dated August 7, 2021, and a
8  Bank card not in defendant SAMUELS's name, containing the caption
9  "They gang banging [Bank 2], I simply flew back to [Bank 1]."

10      <u>Overt Act No. 16:</u>   On August 11, 2021, defendant SAMUELS, who
11  was using Instagram handle "shootaswish59_," posted to his Instagram
12  story an image of a redacted [Bank 2] receipt dated July 12, 2021,
13  listing a $7,000 check deposit into a bank account under the name
14  "M.," stating "New [Bank 2] drip no matter how old 2500 on spot wanna
15  learn dm for entry fee."

16      <u>Overt Act No. 17:</u>   On September 13, 2021, the Instagram handle
17  "ranks.gusto" sent an Instagram message to defendant SAMUELS, who was
18  using Instagram handle "shootaswish95_," stating that banks were
19  "spit[ting] out" his "slips," and in response, defendant SAMUELS told
20  him what ink to use to print fraudulent checks.

21      <u>Overt Act No. 18:</u>   On September 14, 2021, the Instagram handle
22  "realstakksbee" sent an Instagram message to defendant SAMUELS, who
23  was using Instagram handle "shootaswish95_," asking defendant SAMUELS
24  "is there anything else I need besides the computer, printer and
25  Checkbuilder pro," to which defendant SAMUELS responded, "No that's
26  gucci."

27      <u>Overt Act No. 19:</u>   On September 14, 2021, a conspirator, Y.R.,
28  paid CC-1 $300 using the Zelle payment application.

11

Overt Act No. 20:   On September 16, 2021, defendant SAMUELS sent CC-1 a text message stating "U still aint sending nothing . . . this is business n people complaining," to which CC-1 responded "I GOT YOU. . . the girl goes to lunch I'll send them on tele . . ."

Overt Act No. 21:   On September 16, 2021, the Instagram handle "bandhunta" sent an Instagram message to defendant SAMUELS, who was using Instagram handle "shootaswish95_," asking defendant SAMUELS to send checks from Bank 3, and "I'll promote you," to which defendant SAMUELS replied, "Promo first."

Overt Act No. 22:   On September 17, 2021, the Instagram handle "cheatcodegwap" sent an Instagram message to defendant SAMUELS, who was using Instagram handle "shootaswish95_," stating "Let's work fam . . . I got hella cards but my bank plug playing," to which defendant SAMUELS responded "Bank plug?  You got an inny?" and "cheatcodegwap" responded "Yup at a credit union that's how I get my food," to which defendant SAMUELS responded, "Get them on point."

Overt Act No. 23:   On September 17, 2021, the Instagram handle "rah.cash" sent an Instagram message to defendant SAMUELS, who was using Instagram handle "shootaswish95_," asking for the information "underneath the check number" for the last check defendant SAMUELS had posted on his Telegram chat group "Smoke Season."

Overt Act No. 24:   On September 22, 2021, defendant SAMUELS, who was using Instagram handle "shootaswish95_," sent an Instagram message to Instagram handle "g_wuzzo" stating that it cost $800 to join his chat.

Overt Act No. 25:   On September 27, 2021, defendant SAMUELS, who was using Instagram handle "shootaswish95_," sent an Instagram

12

message to the Instagram handle "topfivekeyaa," instructing on what ink should be used to print fraudulent checks.

Overt Act No. 26:   On September 29, 2021, Instagram handle "cqkash" sent an Instagram message to defendant SAMUELS, who was using Instagram handle "shootaswish95_," stating "Got a [Bank 2] Member since 2015," to which defendant SAMUELS replied "join chat n I'll collab with u Ugonna make it right back. . . 500."

Overt Act No. 27:   On October 5, 2021, CC-1 texted defendant SAMUELS "I'm helping another branch out And still looking at accounts," to which defendant SAMUELS responded, "Send me pics m stuff."

Overt Act No. 28:   On October 6, 2021, CC-1 texted defendant SAMUELS " have some good ones For you with balance I'm going to keep trying . . . If my last resort is send em here & delete them."

Overt Act No. 29:   On October 20, 2021, defendant SAMUELS, who was using Instagram handle "shootaswish95_," sent an Instagram message to the Instagram handle "bhiebeaadhfadedff," stating that joining the chat for "cooking classes" cost $500.

Overt Act No. 30:   On October 26, 2021, a conspirator, Y.R., paid CC-1 $500 using the Cash App payment application.

Overt Act No. 31:   On October 28, 2021, an unknown individual sent an Instagram message to defendant SAMUELS, who was using Instagram handle "shootaswish95_," asking for his "booking fee for philly?" to which defendant SAMUELS responded, "5k 1500 deposit."   In response, the unknown individual wrote, "[Bank 1] ya thing rt?"

Overt Act No. 32:   On an unknown date but no later than November 2, 2021, defendant SAMUELS, who was using Instagram handle "shootaswish95_," posted a story to Instagram with the following

13

caption "Nov 2-5th Nov 8-12th, Nov 29 – dec 3rd . . . Sold out dates! I'm booked up.  But if u want turn yo self yo yo own boss, we also give tutorials . . . all it costs is 500$ & I'll add u to a chat that can change your life."

Overt Act No. 33:   On November 22, 2021, the Instagram handle "shreem_loco823" sent an Instagram message to defendant SAMUELS, who was using Instagram handle "shootaswish95_," asking for the best "setty," before paying to join the chat, to which SAMUELS responded with the name of a check design software.

Overt Act No. 34:   On November 22, 2021, Instagram handle "moe_2x" sent an Instagram message to defendant SAMUELS, who was using Instagram handle "shootaswish95_," asking if defendant SAMUELS "got some business slips for [Bank 4]?" to which defendant SAMUELS responded, "U got 300 . . .?"

Overt Act No. 35:   On November 23, 2021, a conspirator, Y.R., paid CC-1 $100 using the Zelle payment application.

Overt Act No. 36:   On December 2, 2021, defendant SAMUELS, who was using Instagram handle "shootaswish95_," posted a story posted an Instagram story that included an exchange with CC-1, with the caption "Tap in w me if you got [Bank 2] or [Bank 1] Certified 20k a week."]

Overt Act No. 37:   On December 5, 2021, a conspirator, Y.R., paid CC-1 $400 using the Cash App payment application.

Overt Act No. 38:   On December 8, 2021, defendant SAMUELS, using his company Swish Entertainment Inc., paid CC-1 $400 using the Zelle payment application.

Overt Act No. 39:   On December 14, 2021, defendant SAMUELS, who was using Instagram handle "shootaswish95_," sent an Instagram message to Instagram handle "apollosway" stating that defendant

14

SAMUELS had switched to a new Telegram chat group because "Some weird shit was going on some now we can call n verify ask . . . on ft if they law enforcement."

Overt Act No. 40:   On December 17, 2021, Instagram handle "yfn_ashlet" sent an Instagram message to defendant SAMUELS, who was using Instagram handle "shootaswish95_," asking whether "yfn_ashlet" could buy Bank 1 checks through defendant SAMUELS's Telegram chat when he joined, to which defendant SAMUELS responded, "Yea they sell."

Overt Act No. 41:   On an unknown date but no later than December 31, 2021, defendant SAMUELS, who was using Instagram handle "shootaswish95_," posted a story to Instagram with the following text "& just like that I'm boutta book up for the rest of the year . . . Fl cost a lil more, I got bad luck there when it comes to the police but for the right price I'll make a way."

Overt Act No. 42:   On an unknown date, defendant SAMUELS, who was using Instagram handle "shootaswish95_," posted a story to Instagram with the following text "The plastic not enough when I got ppl booking me to fly in & get them rich."

Overt Act No. 43:   On January 18, 2021, a conspirator, Y.R., paid CC-1 $500 using the Zelle payment application.

Overt Act No. 44:   On January 21, 2021, a conspirator, Y.R., paid CC-1 $500 using the Zelle payment application.

Overt Act No. 45:   On February 11, 2022, defendant SAMUELS, who was using Instagram handle "shootaswish95_" posted to his story on Instagram "IF YOU WANNA JOIN CHAT OR WANNA COLLAB THIS WEEK MUST BE A [Bank 2]- OA or [Bank 1]!"

1      <u>Overt Act No. 46:</u>  On February 17, 2022, defendant SAMUELS

2  texted CC-1 "Let's another 50 1500 vybez."

3      <u>Overt Act No. 47:</u>  On an unknown date, defendant SAMUELS and

4  coconspirators printed two fraudulent checks, each in the amount of

5  $13,850, each dated February 17, 2022, with victim AVC Corporation

6  listed as the payor, with AVC Corporation's real bank account number

7  at Bank 2 listed as the payor account, made out to a third-party,

8  M.B.

9      <u>Overt Act No. 48:</u>  On March 2, 2022, coconspirators attempted

10  to deposit a total of five fraudulent checks, each in the amount of

11  $13,850, totaling $69,250, each dated February 17, 2022, with victim

12  AVC Corporation listed as the payor, with AVC Corporation's real bank

13  account number at Bank 2 listed as the payor account, with one of

14  them made out to a third-party, M.B.

15      <u>Overt Act No. 49:</u>  On March 8, 2022, Instagram handle "daewop"

16  sent an Instagram message to defendant SAMUELS, who was using

17  "shootaswish95_," stating "I got slip innies too," to which defendant

18  SAMUELS responded, "I neeeeddd Weee can def lock in on that," and

19  "daewop" responded "its good I got ah few diff innies and im working

20  on getting sum keys."

21      <u>Overt Act No. 50:</u>  On March 10, 2022, Instagram handle

22  "lantana_kb" sent an Instagram message to defendant SAMUELS, who was

23  using "shootaswish95_," stating "got cash for the slip," to which

24  defendant SAMUELS responded that there "is a line For the food."

25      <u>Overt Act No. 51:</u>  On March 16, 2022, CC-1 accessed victim

26  A.R.'s account on Bank 1's customer and account management system.

27      <u>Overt Act No. 52:</u>  Between March 16, 2022 and March 17, 2022,

28  CC-1 sent information regarding victim A.R.'s account to defendant

1   SAMUELS so that defendant SAMUELS and coconspirators could create and
2   deposit fraudulent checks drawn on victim A.R.'s account.

3      Overt Act No. 53:   On March 17, 2022, defendant SAMUELS aided
4   and abetted a coconspirator wearing a face mask and medical scrubs in
5   depositing a $12,445 fraudulent check drawn on victim A.R.'s account
6   into M.C.'s account, at a Bank 1 branch in Bakersfield, California.

7      Overt Act No. 54:   On March 17, 2022, defendant SAMUELS aided
8   and abetted a coconspirator in depositing a $12,986 fraudulent check
9   drawn on victim A.R.'s account into S.F.'s account, at a Bank 1
10  branch in Bakersfield, California.

11     Overt Act No. 55:   On March 18, 2022, a coconspirator made
12  $5,000 in cash withdrawals from M.C.'s account, into which the
13  $12,445 fraudulent check had been deposited, in the following
14  increments:  $3,500 from a teller inside a Bank 1 branch in Reseda,
15  Los Angeles County, followed by a $1,500 withdrawal from an ATM
16  located outside the same bank branch.

17     Overt Act No. 56:   On March 18, 2022, a coconspirator made a
18  $2,500 Zelle withdrawal from S.F.'s account, into which the $12,986
19  fraudulent check had been deposited.

20     Overt Act No. 57:    On March 18, 2022, a coconspirator made
21  multiple debit and cash withdrawals totaling over $4,000 in Fort
22  Lauderdale, Florida from S.F.'s account, into which the $12,986
23  fraudulent check had been deposited.

24     Overt Act No. 58:   On March 21, 2022, a coconspirator made a
25  $2,500 Zelle withdrawal from S.F.'s account, into which the $12,986
26  fraudulent check had been deposited.

27     Overt Act No. 59:   On March 25, 2022, defendant SAMUELS aided
28  and abetted coconspirators in depositing multiple fraudulent checks

17

into third-party accounts at Bank 2 branches in the District of Arizona.

Overt Act No. 60:   On an unknown date, but no later than March 28, 2022, within the WINNING OUR ONLY OPTION Telegram chat group, coconspirators circulated links to illicit websites for obtaining stolen victim PII.

Overt Act No. 61:   On March 28, 2022, at a residence in Orange County, defendant SAMUELS and a coconspirator knowingly possessed approximately 677 stolen and/or counterfeit checks, including a United States Treasury check issued by a victim, the United States Government, Internal Revenue Service ("IRS") to an individual victim, A.R.G., and two checks made out to the United States Treasury by individual victims, M.K. and B.A.N.R., in connection with 2021 federal taxes owed.

Overt Act No. 62:   On March 28, 2022, at a residence in Orange County, defendant SAUMUELS and a coconspirator knowingly possessed approximately fourteen stolen money orders not in the name of defendant SAMUELS or the coconspirator, the residents, with a total value of $3,596.70.

Overt Act No. 63:   On March 29, 2022, while detained at Metropolitan Detention Center ("MDC"), defendant SAMUELS instructed a coconspirator to withdraw in separate transactions of $3,000 each, and not more than $10,000 a day.

Overt Act No. 64:   On March 29, 2022, while detained at MDC, defendant SAMUELS instructed a coconspirator to continue to run the operation which defendant SAMUELS said generates an automatic $150,000 a month.

1    Overt Act No. 65:   On March 29, 2022, while detained at MDC,

2  defendant SAMUELS instructed a coconspirator that she should not

3  spend additional money, and the coconspirator should "bury that shit

4  in your dad's backyard, hide it in his crib where nobody near know

5  where it's at."

6    Overt Act No. 66:   On March 29, 2022, while detained at MDC,

7  defendant SAMUELS instructed a coconspirator that you "cannot figure

8  out a scammer, unless the scammer tells you he scams."

9    Overt Act No. 67:   On March 30, 2022, while detained at MDC,

10  defendant SAMUELS instructed a coconspirator to locate and reach out

11  to CC-1.

12    Overt Act No. 68:   On March 31, 2022, while detained at MDC,

13  defendant Samuels instructed a coconspirator to locate and reach out

14  to CC-1, to send money to a coconspirator CC-1 via CashApp, and to

15  send money with a message to call defendant SAMUELS.

16

17

18

19

20

21

22

23

24

25

26

27

28

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 924(d)(1) and Title 28, United States Code, Section 2461(c), in the event of defendant's conviction of the offenses set forth in Counts One and Two of this First Superseding Information.

2.    If so convicted, the defendant shall forfeit to the United States of America the following:

(a)    All right, title, and interest in any firearm or ammunition involved in or used in such offense; and

(b)    To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant, if so convicted, shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

//

//

//

20

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982]

1.    Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), in the event of defendant's conviction of the offense set forth in Count Three of this First Superseding Information.

2.    Defendant, if so convicted, shall forfeit to the United States of America the following:

(a) All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has

//

//

//

22

1  Been substantially diminished in value; or (e) has been commingled

2  with other property that cannot be divided without difficulty.

3

4                                   JOSEPH MCNALLY
                                    Attorney for the United States,
5                                   Acting Under Authority Conferred by
                                    28 U.S.C. § 515
6
                                    MACK E. JENKINS
7                                   Assistant United States Attorney
                                    Chief, Criminal Division
8

9

10                                  SCOTT M. GARRINGER
                                    Assistant United States Attorney
11                                  Deputy Chief, Criminal Division

12                                  IAN V. YANNIELLO
                                    Assistant United States Attorney
13                                  Deputy Chief, General Crimes Section

14                                  RACHEL N. AGRESS
                                    Assistant United States Attorney
15                                  International Narcotics, Money
                                    Laundering and Racketeering Section
16
                                    DAVID PI
17                                  Assistant United States Attorney
                                    Major Frauds Section
18

19

20

21

22

23

24

25

26

27

28